Petition for Writ of Mandamus Conditionally Granted and Opinion filed
September 23, 2003









Petition for Writ of Mandamus Conditionally Granted
and Opinion filed September 23, 2003.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00180-CV

____________

 

IN RE MEDIA ARTS GROUP, INC., Relator

 

 



 

ORIGINAL PROCEEDING

WRIT OF MANDAMUS



 



 

O
P I N I O N

Relator,
Media Arts Group, Inc., seeks a writ of mandamus ordering respondent, the
Honorable Susan E. Criss, to stay the underlying suit and compel arbitration.  We
conditionally grant the writ.

I.  Factual And
Procedural Background








Media
Arts is a California-based company that produces artwork based on Thomas
Kinkade=s
paintings and sells it through gallery dealers throughout the United
States.  Real parties in interest, Bay
Area Galleries, Inc., Rockbrook Galleries, Inc., and KY Arts, Inc. d/b/a/
Thomas Kinkade Signature Galleries of West Texas, and on behalf of all those
similarly situated (collectively, the AGallery Owners@),[1]
contracted with Media Arts to sell Kinkade=s artwork at their galleries in
Texas and California.  From 1998 to 2000,
the Gallery Owners, through their officers, executed a total of seven Adealer
agreements@ for their various galleries.  Alvin and Sandra Dahl executed two dealer
agreements for Rockbrook Galleries, Inc. and four dealer agreements for Bay
Area Galleries, Inc.  Robert and Kathy
Young executed one dealer agreement for KY Arts, Inc.

Each
dealer agreement consists of three parts: (1) the basal dealer agreement; (2)
Exhibit A (addressing the geographical district covered by the agreement); and
(3) the Standard Terms and Conditions.[2]  The dealer agreement and Exhibit A contain
the parties= signatures.  The Standard Terms and Conditions do not
contain the parties= signatures (or any place for
signatures), but  they are attached to,
and incorporated by reference into, the dealer agreement.  Each Standard Terms and Conditions includes
the following provision:

22.       Arbitration

THE PARTIES AGREE THAT ALL DISPUTES
BETWEEN THEM SHALL FIRST BE SUBMITTED FOR INFORMAL RESOLUTION TO THEIR CHIEF
EXECUTIVE OFFICERS, OR IF NO CHIEF EXECUTIVE OFFICER, TO THE OWNERS.  ANY REMAINING DISPUTE SHALL BE SUBMITTED TO A
PANEL OF THREE (3) ARBITRATORS WITH EACH PARTY CHOOSING ONE (1) PANEL MEMBER,
AND THE THIRD PANEL MEMBER BEING CHOSEN BY THE FIRST TWO (2) PANEL MEMBERS. THE
PROCEEDING SHALL BE CONDUCTED IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION
RULES OF THE AMERICAN ARBITRATION ASSOCIATION. 
THE AWARD OF THE ARBITRATORS SHALL INCLUDE A WRITTEN EXPLANATION OF
THEIR DECISION.  THIS ARBITRATION
PROCEEDING WILL BE BINDING UPON THE PARTIES.








The
Gallery Owners filed the underlying suit against Media Arts, Lightpost
Publishing, Inc., Thomas Kinkade, and two Media Arts employees, Charles Sebring
and Leon Mendez, pleading breach of contract, tortious interference with
business relations, business disparagement, breach of fiduciary duties, breach
of express and implied warranties, violations of the Deceptive Trade Practices
Act (ADTPA@),
and civil conspiracy.   In essence, the
Gallery Owners allege the defendants eliminated the Gallery Owners from the
market by selling artwork directly to consumers at discount stores while
requiring the Gallery Owners to sell at inflated prices.

Media
Arts filed a motion in the trial court to stay the suit and compel
arbitration.  Media Arts also initiated
an arbitration proceeding with the American Arbitration Association to recover
$1,046,000 in unpaid invoices.  After a
hearing on December 19, 2002, the trial court orally denied Media Arts=
motion.  On January 31, 2003, the trial
court entered a written order denying Media Arts= motion for reconsiderationCthis
mandamus proceeding followed.

II.  Standard
of Review

A
party seeking to compel arbitration by mandamus must establish the existence of
an arbitration agreement subject to the Federal Arbitration Act (AFAA@)
and that the claims at issue fall within the scope of the arbitration
agreement.  See In re J.D. Edwards
World Solutions Co., 87 S.W.3d 546, 549 (Tex. 2002); In re FirstMerit
Bank, N.A., 52 S.W.3d 749, 753 (Tex. 2001). 
If the arbitration agreement encompasses the claims at issue and there
are no defenses to its enforcement, the court has no discretion but to compel
arbitration and stay its own proceedings. 
See J.D. Edwards, 87 S.W.3d at 549; FirstMerit, 52 S.W.3d
at 753-54.  When a trial court
erroneously denies a motion to compel arbitration under the FAA, the movant has
no adequate remedy at law and is entitled to mandamus relief.  See J.D. Edwards, 87 S.W.3d at 551; FirstMerit,
52 S.W.3d at 753.








III.  Discussion

In three issues, Media Arts contends
it is entitled to mandamus relief because (1) it established the existence of
an arbitration agreement subject to the FAA; (2) the Gallery Owners=
claims fall within the scope of the arbitration agreement;[3]
and (3) the Gallery Owners are required to arbitrate their claims against all
defendants.[4]   In response, the Gallery Owners challenge
the existence of an arbitration agreement. 
They also assert several defenses to enforcement of the arbitration
agreement, if any, including waiver, fraudulent inducement, and unconscionability.

A.      What Law
Applies?

Preliminarily,
we will address the disagreement among the parties regarding what law applies
to this dispute.  Media Arts contends the
FAA applies because the dealer agreements involve interstate commerce, and the
FAA preempts application of state law. 
The Gallery Owners contend California law applies because state contract
law governs the arbitrability of disputes, and the dealer agreements contain
California choice of law provisions.[5]








Media
Arts is correct that the FAA makes enforceable arbitration agreements in
contracts involving interstate commerce. 
See 9 U.S.C. ' 2 (1999);[6]
Allied Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 273-74
(1995);  In re Halliburton Co., 80
S.W.3d 566, 568 (Tex. 2002).  However,
the Gallery Owners dispute that they agreed to arbitrate in the first place.[7]  By its own terms, the FAA applies only where
the parties have agreed to arbitrate.   See
9 U.S.C. ' 2. 
It was designed to overrule the judiciary=s longstanding refusal to enforce
arbitration agreements and place them upon the same footing as other
contracts.  See Volt Info. Sci., Inc.
v. Bd. of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468, 474
(1989); Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 225‑26
(1987).  The FAA simply requires courts
to enforce privately negotiated agreements to arbitrate, like other contracts,
in accordance with their terms.  See
Volt, 589 U.S. at 478.  It does not
require parties to arbitrate when they have not agreed to do so.  See id. 








Generally,
when deciding whether the parties agreed to arbitrate a certain matter, courts
should apply ordinary state law principles governing the formation of
contracts.  See First Options of
Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995);  Halliburton, 80 S.W.3d at 568.   Therefore, while the FAA preempts
application of state law that would render an existing arbitration agreement
unenforceable, it does not preempt application of state law to determine the
existence of an arbitration agreement.  See
Halliburton, 80 S.W.3d at 568-73 (applying FAA to compel arbitration after
determining arbitration agreement existed under substantive Texas law); Jack
B. Anglin v. Tipps, 842 S.W.2d 266, 271 (Tex. 1992) (citing Volt,
489 U.S. at 478-79, and stating FAA requires courts to compel arbitration when
the parties have so provided in their contract, despite any state
legislative attempts to limit the enforceability of arbitration agreements).  Further, the FAA provides that arbitration
agreements in contracts involving interstate commerce are enforceable Asave
upon such grounds as exist at law or in equity for the revocation of any
contract.@ 
See 9 U.S.C. '2. 
Therefore, generally applicable state contractual defenses may
invalidate an arbitration agreement without contravening the FAA.  See Doctor=s
Assoc., Inc. v. Casarotto,
517 U.S. 681, 686-87 (1996); In re AutoNation USA Corp., 105 S.W.3d 190,
198 (Tex. App.CHouston [14th Dist.] 2003, orig.
proceeding).








Accordingly,
to determine whether the FAA requires arbitration in this case, we must first
determine, under state law, whether an arbitration agreement exists and whether
the Gallery Owners proved any defenses to its 
enforcement.   See In re
Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 573 (Tex. 1999) (stating once
party seeking arbitration presents evidence of an arbitration agreement, burden
shifts to opposing party to present evidence the agreement was unconscionable,
induced or procured by fraud or duress, or that the other party waived its
right to arbitrate).  However, the
Gallery Owners= contention that the parties chose
California law to govern these issues presents a more difficult question.[8]  Nevertheless, we need not resolve the choice
of law issue because we find the existence of an arbitration agreement, and no
defenses to its enforcement, under both California and Texas law.  See Fraud-Tech, Inc. v. Choicepoint, Inc.,
102 S.W.3d 366, 377B78 (Tex. App.CFort
Worth 2003, no pet. h.) (citing Duncan v. Cessna Aircraft Co., 665
S.W.2d 414, 419 (Tex. 1984) and holding court need not decide which state=s
law applies if no conflict exists on the issues); Chesapeake Operating, Inc.
v. Nabors Drilling USA, Inc., 94 S.W.3d 163, 168B69
(Tex. App.CHouston [14th Dist.] 2002, no pet.)
(reviewing Texas and Louisiana law on issue before conducting choice of law
analysis because Awe need not decide which law applies
if it makes no difference.@).

B.      Existence
of An Arbitration Agreement

To
challenge the existence of an arbitration agreement, the Gallery Owners contend
the Standard Terms and Conditions were not attached to all their dealer
agreements at the time they were executed, and, therefore, they were unaware of
the arbitration provisions contained therein. 
Specifically, Alvin Dahl testified the Standard Terms and Conditions
were not attached when he executed his first dealer agreement.[9]  Instead, he first saw the Standard Terms and
Conditions several months later when he received a complete copy of the dealer
agreement signed by Media Arts.  This
argument applies only to the Dahls= first dealer agreement because they
concede the Standard Terms and Conditions were attached to their five
subsequent dealer agreements at the time they were executed, and they were
aware of the arbitration provisions in the subsequent agreements.[10]
Kathy Young also disputes that the Standard Terms and Conditions were attached
to the one dealer agreement she executed on behalf of KY Arts, although her
testimony was not as unequivocal as Dahl=s.[11]  The Gallery Owners maintain this testimony
raised a factual dispute on whether all their dealer agreements include an
arbitration agreement, and the trial court acted within its discretion in
resolving this factual dispute in their favor.[12]  We disagree.








Regardless
of the Gallery Owners= testimony, the dealer agreements
explicitly state that the Standard Terms and Conditions are attached and that
the dealer agreements consist in part of the Standard Terms and
Conditions.  The following statement appears
on the first page of each dealer agreement immediately below the title:

The
following Media Arts Group, Inc. Dealer Agreement (AAGREEMENT@)
consists of the Signature Dealer Agreement (ADealer Agreement@),
Exhibit A which addresses Dealer=s District (AExhibit
AA@)
and the Standard Terms and Conditions as attached hereto and
incorporated herein . . .

(Emphasis
added).

Further,
the entire dealer agreement consists of fourteen pages.  There is a footer on each page noting its
place in the sequential orderC APage 1 of 14@,
APage
2 of 14@,
etc.  The Standard Terms and Conditions
comprise pages 9 through 14.  Therefore,
it is abundantly clear to anyone reading the dealer agreement that it consists
in part of the Standard Terms and Conditions.[13]








Under
California law, the general rule is that when a person with the capacity of
reading and understanding an instrument signs it, he is, in the absence of
fraud and imposition, bound by its contents, and is estopped from saying that
its provisions are contrary to his intentions or understanding.  See Jefferson v. Cal. Dept. of Youth Auth.,
48 P.3d 423, 425 (Cal. 2002) (citing Palmquist v. Mercer, 272 P.2d 26
(Cal. 1954)).  Similarly, under Texas
law, a person is obligated to protect himself by reading what he signs and,
absent fraud, may not excuse himself from the consequences of failing to meet
that obligation.  See First City
Mortg. Co. v. Gillis, 694 S.W.2d 144, 147 (Tex. App.CHouston [14th Dist.] 1985, writ ref=d
n.r.e.) (citing G‑W‑L, Inc. v. Robichaux, 643 S.W.2d 392,
393 (Tex. 1982), overruled on other grounds, Melody Home Mfg. Co. v.
Barnes, 741 S.W.2d 349, 355 (Tex. 1987)). 
In the absence of fraud, one who signs an agreement, without knowledge
of its contents, is presumed, to have consented to its terms.  See id.[14]  Consequently, a party to a contract may not
successfully claim that he believed the provisions of the contract were
different from those plainly set out in the contract or that he did not
understand the meaning of the language used. See Amouri v. Southwest Toyota,
Inc., 20 S.W.3d 165, 169 (Tex. App.CTexarkana 2000, pet. denied).

Because
the dealer agreements explicitly state the Standard Terms and Conditions are
attached, the Gallery Owners are estopped to deny that the Standard Terms and
Conditions were actually attached to the dealer agreements at the time they
signed them.  Further, because the dealer
agreements explicitly state they consist in part of the Standard Terms and
Conditions, the Gallery Owners cannot now claim they were unaware the Standard Terms
and Conditions were a part of the dealer agreements.  Quite simply, the law charges the Gallery
Owners with knowledge of their existence. 
Therefore, the Standard Terms and Conditions, including the arbitration
provisions contained therein, are part of the first dealer agreement executed
by the Dahls and the one dealer agreement executed by Young.  Accordingly, we conclude that all the dealer
agreements executed by the Gallery Owners include an arbitration agreement.

C.      Defenses
to Enforcement of Arbitration Agreement

Having
found the existence of an arbitration agreement in all the dealer agreements,
we consider the Gallery Owners= defenses to its enforcement.

1.       Waiver








The
Gallery Owners contend that Media Arts waived enforcement of the arbitration
agreements.  They rely solely on Alvin
Dahl=s
testimony regarding a statement made to him by a Media Arts employee.  According to Dahl, he inquired about the arbitration
provision when the first dealer agreement was returned to him signed by Media
Arts.  He initially testified as follows:

Q.        And
the terms and conditions that were attached as part of that book were exactly
the same terms and conditions that had been sent to you back after you signed
the initial one in March of 1999?

A.        Yeah. 
Actually I questioned people on that arbitration clause in that one and
was told, AIt will never be used, so don=t
worry about it,@ at that time by the district
manager.

However,
Dahl later clarified his testimony and said he was not told the arbitration
provision would never be used; instead, he was told it had never
been used:

Q.        Mr.  Dahl, you said that somebody had told you
that Media Arts Group doesn=t enforce those arbitration agreements.  Who told you that?

A.        No, what I said basically was I called
the district manager once we finally got that in.  And in the process there was a new district
manager coming in, and Randy basically said he would check on it.  And he called me back; and he said, >I
checked on it, and nobodyCthey have never had to use it an
arbitration agreement,= and just basically don=t
worry about it.[15]

Under
both California and Texas law, waiver is generally defined as the intentional
relinquishment of a known right or conduct inconsistent with claiming that
right.  See Platt Pacific, Inc. v.
Andelson, 862 P.2d 158, 162 (Cal. 1993);  Engalla v. Permanente Med. Group, Inc.,
938 P.2d 903, 923 (Cal. 1997); United States Fid. & Guar. Co. v. Bimco
Iron & Metal Corp., 464 S.W.2d 353, 357 (Tex. 1971); Oakwood,
987 S.W.2d at 574.  There is a strong
presumption against waiver of arbitration, and any doubts should be resolved in
favor of arbitration.  See Moses H.
Cone Mem=l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).








The
Gallery Owners have not shown that the statement allegedly made to Dahl
constitutes waiver of Media Arts= right to arbitrate.[16]  The statement that Media Arts has never had
to use an arbitration agreement in the past does not amount to a representation
it will not enforce an arbitration agreement against the Gallery Owners in the
future.  Further, it is unclear whether
the employee said Adon=t worry about it,@
or this was Dahl=s interpretation of their
conversation.  Regardless, even if the
trial court concluded the Media Arts= employee said Adon=t
worry about it,@ this statement is entirely too
vague to be interpreted as an intentional relinquishment of Media Arts=
right to arbitrate.  Accordingly, Media
Arts did not waive its right to arbitrate the Gallery Owners=
claims.

2.       Fraudulent
Inducement

The
Gallery Owners also rely on this alleged statement to Dahl to prove fraudulent
inducement.[17]  They assert the statement fraudulently
induced the Dahls to agree to the arbitration provision in their subsequent
dealer agreements.[18]








Under
both California and Texas law, a party claiming fraudulent inducement must
prove (1) a material representation; (2) that was false; (3) knowledge of
falsity; (4) intent to defraud, i.e. to induce reliance; (5) justifiable
reliance; and (6) resulting damage. See Lazar v. Superior Court, 909
P.2d 981, 984-85 (Cal. 1996);  FirstMerit,
52 S.W.3d at 758.  Here, the Gallery
Owners have not proved the most basis element of a fraudulent inducement claimCa
material false representation.  They do
not assert that the statement that Media Arts has never to had to use an
arbitration agreement was false.  See
Oakwood, 987 S.W.2d  at 574  (seller=s representation that home sale
would not go through if buyers did not sign arbitration agreement did not prove
buyers were fraudulently induced to sign arbitration agreement absent assertion
that the statement was false).  Again,
the statement Adon=t worry about it,@
if made by Media Arts, is entirely too vague to constitute a material false
representation that Media Arts would not enforce the arbitration agreements.  See FirstMerit, 52 S.W.3d at 758 (refusing
to invalidate arbitration provision based on fraud because there was no
evidence the sellers actually misrepresented the terms of the provision); Engalla,
938 P.2d at 919 (stating element of material misrepresentation is judged by
whether a reasonable person would attach importance to its existence in
determining choice of action in the transaction in question).  Accordingly, the Gallery Owners have failed
to prove their fraudulent inducement defense.

3.       Unconscionability

Finally,
the Gallery Owners assert the arbitration agreements are void because they are
unconscionable.  Under both California
and Texas law, unconscionability includes two aspects: (1) procedural
unconscionability, which focuses on the circumstances surrounding the adoption
of the arbitration provision; and (2) substantive unconscionability, which
focuses on the terms of the arbitration provision itself.  See Little v. Auto Steigler, Inc., 63
P.3d 979, 983 (Cal. 2003), petition for cert. filed, 71 USLW 3751 (May
22, 2003) (NO. 02-1720); Halliburton, 80 S.W.3d at 571. 








The
Gallery Owners argue that the arbitration provisions are per se
procedurally unconscionable because they are adhesion contracts imposed on them
on a Atake
it or leave it@ basis.  They assert that Media Arts simply attached
the Standard Terms and Conditions to the back of all dealer agreements, Media
Arts had superior bargaining power, and there was no opportunity to
negotiate.  The Gallery Owners rely on
Dahl=s
testimony that he was not in a position to negotiate the removal of the
arbitration provisions because when he noticed the provision in his first
dealer agreement, he had opened one gallery and was constructing another.  Dahl also made a general statement that a
dealer is never in a position to negotiate with Media Arts.

California
law defines an adhesion contract as Aa standardized contract, which,
imposed and drafted by the party of superior bargaining strength, relegates to
the subscribing party only the opportunity to adhere to the contract or reject
it.@
See Armendariz v. Foundation Health Psychcare Servs., Inc., 6 P.3d 669, 689 (Cal. 2000).  Similarly, Texas law defines an adhesion
contract as a contract in which one party has absolutely no bargaining power or
ability to change the contract terms.  See
In re H.E. Butt Grocery Co., 17 S.W.3d 360, 370-71 (Tex. App.CHouston
[14th Dist.] 2000, orig. proceeding).  At
best, Dahl=s testimony suggests the arbitration
provisions may be adhesion contracts because the Gallery Owners had no
opportunity to negotiate.[19]  








However,
an adhesion contact is not automatically unconscionable under California or
Texas law.  See Armendariz, 6 P.3d
at 690;  H.E. Butt, 17 S.W.3d at
371.  For an arbitration agreement to be
found unconscionable under California law, it must be both procedurally
and substantively unconscionable.   See
Little, 63 P.3d at 983; Armendariz, 6 P.3d at 690.  Under Texas law, the party opposing
arbitration must also present some other evidence of unconscionability.  See Oakwood, 987 S.W.2d at 574;
H.E. Butt, 17 S.W.3d at 371.  The
Gallery Owners have presented no other evidence that the arbitration provisions
are unconscionable.  See Oakwood,
987 S.W.2d  at 573-74  (seller=s statement that buyer had to sign
arbitration agreement or it could not finance or take possession of home did
not prove unconscionability).

            In
fact, the Gallery Owners do not argue, or provide any authority, that the
arbitration provisions are substantively unconscionable.[20]  In California, substantive unconscionability
arises from overly harsh or one‑sided contract terms.  See Little, 63 P.3d at 983-84; Armendariz,
6 P.3d at 690.  Texas applies a somewhat
stricter standard to evaluate substantive unconscionabilityCfocusing
not only on one-sided terms, but whether, given the parties=
general commercial background and the commercial needs of the particular trade
or case, the terms are so one-sided that they are unconscionable under the
circumstances existing when the parties made the contract.  See FirstMerit, 52 S.W.3d at 757.








There
is nothing harsh or one-sided about this arbitration provision.  To the contrary, it requires both Media Arts
and the Gallery Owners to arbitrate any potential disputes.  It gives both parties equal participation in
choosing arbitrators. It provides for application of the rules of the American
Arbitration Association. It does not give Media Arts any greater rights than
the Gallery Owners and does not limit the Gallery Owners=
ability to recover in arbitration. Compare Halliburton, 80 S.W.3d at 572
(finding arbitration program not substantively unconscionable because it
allowed both parties to participate in selection of the neutral arbitrator,
allowed pre-arbitration discovery under Federal Rules of Civil Procedure,
preserved all remedies employee could have pursued in court system, allowed
recovery of attorneys= fees, and provided fee for employee
to consult with attorney) with Armendariz, 6 P.3d at 694 (finding
arbitration agreement substantively unconscionable because it required
arbitration of employee=s, but not employer=s,
claims, and limited employee=s, but not employer=s,
potential damages).[21]  Therefore, the Gallery Owners have failed to
prove their unconscionability defense.

V.  Conclusion

Media Arts has established the
existence of an arbitration agreement subject to the FAA, the arbitration
agreement encompasses the claims at issue, and the Gallery Owners have failed
to prove any defenses to its enforcement. 
Therefore, Media Arts has no adequate remedy by appeal from the trial
court=s
refusal to compel arbitration, and mandamus relief is appropriate.  Accordingly, we sustain Media Arts= three issues.  We are
confident the trial court will vacate its oral order of December 19, 2002 and
its written order of January 31, 2003 (denying reconsideration), and will
compel arbitration of the claims in the underlying suit and stay its own
proceedings.  If the trial court fails to
do so, the writ will issue.

 

 

 

 

 

 

/s/        J.
Harvey Hudson

Justice

 

 

 

Judgment rendered and Opinion filed
September 23, 2003.

Panel consists of Justices Yates,
Hudson, and Frost.











[1]  Although the
real parties entitle themselves Aand on
Behalf of All Those Similarly Situated@, there
is no indication the underlying suit has been certified as a class action.





[2]  We will later
address the Gallery Owners= contention that not all the dealer agreements  were complete at they time they were
executed; however, the record demonstrates what a complete dealer agreement
presumably consists of.





[3]  The Gallery
Owners do not dispute that their claims fall within the scope of the
arbitration agreements, if any.  The
arbitration agreements cover Aall disputes@ between
the Gallery Owners and Media Arts, and the claims arise from the contractual
relationship created by the dealer agreements.





[4]  The Gallery
Owners argued to the trial court that arbitration is not required because the
other defendants are not parties to the arbitration agreements, if any.  However, in response to the mandamus
petition, the Gallery Owners do not dispute that they must arbitrate their claims
against all defendants if required to arbitrate their claims against Media
Arts.  Although the Gallery Owners
contracted with Media Arts only, they plead that all defendants are Aone and the same@ and
responsible for the others= acts and plead no individual claims against the other
defendants.   See In re Educ. Mgmt.
Corp., Inc., 14 S.W.3d 418, 424-25 (Tex. App.CHouston [14th Dist.] 2000, orig. proceeding)
(compelling arbitration of claims against non-signatories to arbitration
agreement because they were alter ego claims based on same  operative facts and inherently inseparable
from claims against signatory).





[5]  Each Standard
Terms and Conditions contains the following provision:  AThis
AGREEMENT shall be interpreted in accordance with and governed by the laws of
the state of California, county of Santa Clara, regardless of the place of its
execution or performance.@





[6]  Section 2
provides AA written provision in any maritime transaction or a
contract evidencing a transaction involving commerce to settle by arbitration a
controversy thereafter arising out of such contract or transaction, or the
refusal to perform the whole or any part thereof, or an agreement in writing to
submit to arbitration an existing controversy arising out of such a contract,
transaction, or refusal, shall be valid, irrevocable, and enforceable, save
upon such grounds as exist at law or in equity for the revocation of any
contract.@ 





[7]  The Gallery
Owners do not dispute that the dealer agreements involve interstate
commerce.  They are contracts between a
California based company and Texas corporations for the distribution and sale
of California artwork in Texas and California. 
Further, The Gallery Owners plead that their suit arises from Media Arts= business in Texas.





[8]  The question
is difficult because the California choice-of-law provision is only contained
in the Standard Terms and Conditions; yet, the Gallery Owners vigorously deny
the Standard Terms and Conditions were a part of all their dealer agreements.  Further, after urging application of  California law, the Gallery Owners cite Texas
law in support of their position that no arbitration agreement exists.  Media Arts does not focus on the choice of
California or Texas law because it urges application of federal law; however,
it cites some Texas law in support of its position.





[9]  The Dahls= first dealer agreement was one of the two agreements
for Rockbrook Galleries, Inc.





[10]  Although the
Gallery Owners concede they were aware of the arbitration provisions in their
subsequent agreements, they contend they were fraudulently induced to agree to
them.  We will address this contention
later as a defense to arbitration.





[11]  At first,
Young testified she did not know whether the Standard Terms and Conditions were
attached when she signed the dealer agreement because she did not have a copy
in her records.  However, when later
asked again if the Standard Terms and Conditions was attached, she testified Anot to my knowledge.@ 





[12]  To counter
this testimony, Media Arts presented the affidavit of a former officer, James
Landrum, who testified Media Arts= policy
was to send unsigned copies of the dealer agreements, including Exhibit A and
the Standard Terms and Conditions, to dealers for signature.  If a dealer returned an incomplete or
unsigned agreement, Media Arts requested that the dealer return the rest of the
agreement with all required signatures, or Media Arts sent another complete
copy for signature.  He signed the two
Rockbrook Galleries agreements and the KY Arts agreement and would not have
done so without ensuring the gallery owner had signed and returned the entire
agreement.





[13]  In addition,
the Standard Terms and Conditions are referred to in the body of the dealer
agreement.





[14]  While the
Dahls allege they were fraudulently induced to enter into the arbitration
provisions in their five subsequent dealer agreements, they do not allege fraud
as to this first dealer agreement.





[15]  Young did not
testify regarding any such conversations with Media Arts or present any
evidence to support waiver of the arbitration provision in the KY Arts dealer
agreement.





[16]  Waiver
commonly becomes an issue in the enforcement of arbitration agreements when a
party has performed some act allegedly inconsistent with claiming the right to
arbitrate, such as failing to timely initiate arbitration or participating in
the legal process.  See, e.g., Engalla,
938 P.2d at 923;  In re Bruce Terminix
Co., 988 S.W.2d 702, 704 (Tex. 1998). 
Here, the Gallery Owners rely on an express statement to prove waiver,
so we will determine whether the statement was an intentional relinquishment of
the right to arbitrate.





[17]  Again, Young
has presented no evidence to support a fraudulent inducement defense.





[18]  Media Arts
argues that the the Gallery Owners cannot rely on this statement to avoid
arbitration because their fraudulent inducement claim is not sufficiently
focused on the negotiation and acceptance of the arbitration provision. We
disagree.  The Gallery Owners do not rely
on this statement to avoid the subsequent dealer agreements in their entirety;
instead, they assert the statement induced them to enter into the arbitration
provisions in these subsequent dealer agreements.  See FirstMerit, 52 S.W.3d at 756, 758
(fraudulent inducement defense must specifically relate to the arbitration
provision itself, not the contract as a whole, to defeat arbitration).  Media Arts further argues that this statement
is inadmissible parol evidence because the Gallery Owners rely on it to vary
the terms of the subsequent dealer agreements. 
Under Texas law, at least, we agree. 
Although extrinsic evidence, at times, has been held admissible to show
whether a party was fraudulently induced to enter into a contract, any alleged
reliance on oral representations contrary to the plain wording of the contract
is now, as a matter of law, unreasonable. 
See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A., No.
14-01-00507-CV, 2003 WL 21804311 (Tex. App.CHouston
[14th Dist.] Aug. 7, 2003, no pet. h.) (en banc).





[19]  We question
whether the arbitration provisions were adhesion contracts because an adhesion
contract also has been defined Aas a standardized contract form for consumer
goods and services that are offered on a >take
it or leave it= basis without affording the consumer a realistic
opportunity to bargain and under such conditions that the consumer cannot
obtain the desired product or services except by acquiescing.@  See H.E.
Butt, 17 S.W.3d at 371 n.8 (emphasis added).  The dealer agreements were businessCnot consumerCcontracts.  Although Young=s
gallery was her first business, Dahl had been a businessman for forty
years.  Further, although Dahl had opened
or constructed two galleries when he allegedly first noticed the arbitration
provision, he signed dealer agreements containing the same provision for four
more galleries.





[20]  The Texas
Supreme Court recently held that a court may consider both procedural and
substantive unconscionability in evaluating the validity of an arbitration
provision whereas previously claims of procedural unconscionability were
decided by the courts, but claims of substantive unconscionability were
submitted to the arbitrators.  Halliburton,
80 S.W.3d at 571-72 (abrogating Oakwood to the extent Oakwood
required claims of substantive unconscionability be decided by the
arbitrators).





[21]  In FirstMerit,
the Texas Supreme Court rejected Armendariz to the extent Armendariz
requires mutuality of obligation in arbitration provisions because the
principle is one of preventing oppression and unfair surprise, not of
disturbing the allocation of risks because of superior bargaining power.  See 52 S.W.3d at 757.  Regardless, because the arbitration
provisions here are not one-sided at all, they are not substantively
unconscionable under the California standard or the stricter Texas standard.